**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Magistrate No.: 26-mj-92** |
| **v.** | : | |
| | : | |
| | : | |
| **DONALD HAUBRICK,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant Donald Haubrick be detained pending trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A). Mr. Haubrick is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), based upon his April 26, 2026, distribution of child pornography to another individual online. Distribution of Child Pornography is a crime of violence and there is no condition or combination of conditions that will reasonably assure the safety of children in the community – both in the physical world and online – if Mr. Haubrick is released. As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community and to ensure the defendant's future appearance.

### FACTUAL BACKGROUND

Leading up to Tuesday, April 21, 2026, a Federal Bureau of Investigation (FBI) Washington Field Office (WFO) Task Force Officer (TFO) was acting as an online covert employee (OCE) as part of the Metropolitan Police Department- Federal Bureau of Investigation ("MPD-FBI") Child

1

Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, the OCE entered Fetlife, a social media platform known to the OCE as a place where people meet to discuss various fetishes among other things. The application is an internet-based social networking platform used by individuals with shared interests in alternative sexual lifestyles, including BDSM among other types of fetishes. Users create profiles often using pseudonyms and communicate through private messaging, group forums, and posts with the ability to share images and other digital content. A user on this application, using the screen name, "letseat6977," was subsequently identified as **DONALD HAUBRICK**. **HAUBRICK.  HAUBRICK** is a member of over 40 groups within this platform with the majority of them incest related.

While in Fetlife, the OCE posted a message in at least one of these groups indicating that he was a divorced father. On April 21, 2026, **HAUBRICK** initiated a private chat with the OCE within this fetish social media platform stating, "Son or daughter." The following is a portion of that chat between the OCE and **HAUBRICK**:

OCE: What age makes u cum the hardest

**HAUBRICK**: 12-16

OCE: hot! Same!

**HAUBRICK**: Fresh little bald pussy

**HAUBRICK**: Have a pic of her

OCE: Yeah but typically trade with dads that have similar

**HAUBRICK**: I do

2

**HAUBRICK**: Not my daughter but friends daughter

**HAUBRICK**: But not on here

OCE: what kind do you have and the youngest?

**HAUBRICK**: I have one that is 10 I'm grooming

**HAUBRICK**: Videos pics

The OCE provided his Wire[1] account screen name and began to communicate with **HAUBRICK** via Wire private messaging. **HAUBRICK** used the Wire screen name, @brick1026 with a display name of "Brickdaddy." **HAUBRICK** sent the OCE an image file depicting what appears to be a young female teen lying naked on a bed with her legs slightly spread. During the course of that chat the OCE informed **HAUBRICK** that he was the father of two girls ages 14 and 6. During the course of the chat **HAUBRICK** sent the OCE a video file. The video is one minute and 53 seconds in length and depicts a nude prepubescent female masturbating her vagina with her fingers and rubbing a stuffed animal on her vagina. **HAUBRICK** then sent another video file that is two minutes and 9 seconds in length. This video

---

[1] Wire is a communications application that allows users to exchange encrypted text messages, voice communications, video calls, images, documents, and other digital media over the internet. The application is available on mobile devices, desktop computers, and web-based platforms. Wire utilizes end-to-end encryption technology designed to prevent unauthorized third parties from accessing the content of communications transmitted between users. In addition to one-on-one messaging, the application supports group chats, voice and video conferencing, file sharing, and the use of timed or disappearing messages. Users may create accounts using an email address or telephone number and can synchronize communications across multiple devices associated with the same account.

depicts the same prepubescent girl as described in the video above. In this video she is nude and rubbing the stuffed animal's tongue on her vagina.

During the course of the chat the OCE informed **HAUBRICK** that he is sexually active with his purported 6-year-old daughter. **HAUBRICK** responded, "mmm. Ever share her." **HAUBRICK** sent an image of an erect penis and stated, "Let her play with that." During the course of the chat **HAUBRICK** informed the OCE that he was 90 minutes away from Washington, D.C. and discussed with the OCE what sexual acts he wanted to perform on the OCE's purported 6-year-old daughter. The sexual acts included oral sex on the 6-year-old and placing his penis between her legs. **HAUBRICK** further stated, "I want to video and take pics of me using your daughter." During the course of the chat **HAUBRICK** informed the OCE that he had sexual experience with a minor in the past. **HAUBRICK** stated that he met a mother in a park a year ago and molested her 4 year-old daughter at the mother's house. **HAUBRICK** informed the OCE that he no longer has contact with the mother as she moved but has pictures of the 4-year-old at his home.

On Thursday April 23, 2026, **HAUBRICK** sent the OCE another video via the Wire application. The video is 15 seconds in length and depicts an adult female rubbing an infant's bare vagina with her fingers and licking the infant's bare vagina. During the course of the chat **HAUBRICK** informed the OCE that he works at a hospital stocking medical equipment. **HAUBRICK** made the following statement, "I was in the maternity ward and pediatric wards earlier. Can't have my phone out in those areas. Saw a little 5-6 yr old take her gown off."

During the course of the chat **HAUBRICK** agreed to meet the OCE at a prearranged location for the purpose of engaging in sexual acts with the OCE's purported daughter. However, a few days before the planned meet **HAUBRICK** informed the OCE that he was unavailable to

4

meet due to a work obligation. On Sunday April 26, 2026, **HAUBRICK** sent the OCE image and video files with the Wire social media platform. The following are a description of what was sent:

- An image of a young teen lying on a couch shirtless

- An image depicting what appears to be an adult hand pulling down the panties of a prepubescent child exposing her vagina.

- An image of a what appears to be a prepubescent child touching her bare vagina. An a erect penis is visible near the child's face.

- A video file approximately 2 minutes and 8 seconds in length depicting a prepubescent child inserting a sex toy in her vagina and anus

- A video 34 seconds in length depicting a prepubescent female wearing green shorts. The child is seen masturbating her vagina over her shorts. Towards the end of the video an adult male is seen rubbing his hand on the child's vagina over the shorts.

- A video file four minutes and 25 seconds in length depicting a prepubescent child exposing and touching her bare vagina and exposing her bare anus.

On April 21, 2026, a member of the FBI Child Exploitation Task Force served an administrative subpoena to FetLife for username "letseat6977". On April 21, 2026, Fetlife responded and provided subscriber information including phone number (302) XXX-7393, email address sailor_n_XXXX@yahoo.com, IP logs including Comcast IP address 73.86.66.183, and a former username "militarydaddy75". Fetlife also provided a partial phone number (443) XXX-X042.[2]   On April 23, 2026, a member of the Child Exploitation Task Force served an emergency disclosure request to Comcast for IP address 73.86.66.183 for April 17, 2026, at 11:51:42 UTC.

---

[2] In the information Fetlife provide, the first digit of the last four digits of the phone number was redacted.

On April 23, 2026, Comcast verbally provided the following subscriber information: Kirsten Fitzgerald, XXX North Tartan Drive, Elkton, Maryland 21921. An additional resident was identified at this residence, Donald Haubrick Jr., (YOB: 1978). The Elkton, Maryland address is consistent with Haubrick's statement to the OCE that he was approximately 90 minutes outside of the District of Columbia. According to MVA and commercial database records, the address associated with Haubrick was consistent with the Elkton, Maryland address. The address listed on Haubrick's driver's license is the Elkton, Maryland address. Additionally, Haubrick's Google billing address records listed the Elkton, Maryland address. The records also included an associated telephone number of 443-XXX-6042 and 302-XXX-7393. According to another commercial database, Haubrick, was formerly employed by the United States Navy, which appears consistent with email address sailor_n_XXXX@yahoo.com and the former Fetlife username, "militarydaddy75". According to the same commercial database, Haubrick has been linked to phone number (443) XXX-6042.

On May 29, 2026, law enforcement took the defendant into custody at his home in Elkton, Maryland. Agents interviewed the defendant who admitted to possessing child pornography and stated that he was collecting child pornography in order to turn it over to law enforcement. Agents have thus far partially reviewed the contents of one external hard drive recovered from Haubrick's residence which contains approximately 16 CSAM images.

Law enforcement also learned that Haubrick communicated with an undercover agent in West Virginia on an online platform regarding his sexual interest in children around the same time that he was communicating with the undercover agent in the instant matter.

## APPLICABLE LEGAL STANDARD

The defendant is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), a crime of violence. 18 U.S.C. § 3156(c) defines a "crime of violence" to include violations of Title 110, under which § 2252(a)(2) falls. Further, § 2252(a)(2) gives rise to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008). Even if the defendant does not pose a flight risk, danger to the community by itself is a sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding

militating against release, to be weighed along with other evidence relevant to factors listed in §

3142(g).").  As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as

a factor because it is not simply an evidentiary tool designed for the courts.   Instead, the

presumption reflects Congress's substantive judgment that particular classes of offenders should

ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010)

("To rebut the presumption, therefore, a defendant should 'present all the special features of his

case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

Defendant Haubrick poses a significant danger to children in the community – including

children who are being preyed on over the internet as well as children in the physical world – and

there are no conditions short of detention that will protect children from his predation.  For the

reasons addressed below, the factors outline in 18 U.S.C. § 3142(g) weigh in favor of detention

and the defendant cannot rebut the presumption that he shall remain detained.

### A.    Nature and Circumstances of the Charged Offense

Haubrick's conduct is serious and concerning. His conduct was not limited to distributing

CSAM images to a stranger he met online. Instead, he also sought out a stranger who he believed

had access to a real child and discussed at length his intention to meet that child in person for the

purposes of engaging in sexual contact. Law enforcement also found that the defendant was

messaging another undercover agent in West Virginia related to his sexual interest in children. The

defendant's actions in seeking out an online community to discuss these interests and, in particular,

seeking out an individual who had access to a child shows that the he is using his distribution of

CSAM to get access to real children.

On a broad level, children depicted in sexually explicit images and videos are victimized at the time the images were created, and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.

> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Indeed, Congress has recognized the serious nature of crimes involving child pornography and the long-term damage that these crimes can cause, by specifying that these crimes carry a rebuttable presumption of detention.  § 3142(e)(3)(E).

### B. The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is very strong and weighs in favor of detention.  The government is in possession of the chats between the defendant and the undercover agent in this matter, which are outlined above. The chats on FetLife and Wire both make clear that the defendant knowingly distributed child pornography to the undercover agent. Additionally, the

user attribution is strong. The FetLife account associated with the defendant's chats resolves back to the defendant's phone number and the IP address associated with his residence.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at \*9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors."). No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson,* 2023 WL 1778194, at *9-10. The evidence against Haubrick is strong, suggesting both a heightened danger to the community as well as an elevated risk of flight. The strength of the evidence strongly supports detention, as it indicates the significant risk of danger posed by the defendant.

**C.    History and Characteristics of the Defendant**

While the defendant does not have any criminal history related to sexually-based offenses, his characteristics are still concerning. The defendant admitted to the undercover officer that he previously sexually abused a four-year-old child. In his interview with law enforcement, Haubrick stated that he fabricated that story and did not have contact with a child. Additionally, he stated that he worked in a hospital and saw a child take their hospital gown off in pediatric ward. The defendant's pretrial report indicates that he was employed at ChristianaCare Union Hospital at the time of his arrest. This information in conjunction with his statements to the undercover regarding his intent to meet the undercover to sexually abuse his child show that Haubrick was at the very least attempting to gain access to a real child. Moreover, the fact that he had CSAM stored on an external hard drive shows that he has been collecting this material for some period of time rather than just happening upon it at the time of his conversation with the undercover agent. His lack of criminal history should not weigh in favor of release, rather, his ability to conceal his criminal conduct should weigh in favor of detention.

11

**D. The Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children.   It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982)*,* the Supreme Court referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 458 U.S. 758, n.9.

Moreover, as the Eastern District of New York has found:

> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution

of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." Id. at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008) (S.D.W.Va. April 29, 2008)(unpublished)(noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home and electronically monitored, defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011).

Haubrick sought out the undercover agent in this case because he believed the undercover had access to a real child. In addition to his desire to trade CSAM, he wanted to access an actual child and was making efforts to do so. Therefore, releasing the defendant into the community not only poses a danger to children in the online world, but also a danger to children in the real world. The danger the defendant poses is not mitigated merely by taking away electronic devices and eliminating his use of the internet using a third-party custodian. Any third-party custodian that defense can propose will have electronic devices that they necessarily need to use for daily life. There is a significant risk that the defendant gains access to his custodian's device, particularly when the custodian is sleeping. *See United States v. Urena*, 25-cr-344 (APM) (Urena gained access

13

to his third-party custodian's phone while on pretrial release and observed adult pornography on that phone). Because third-party custodians generally do not do a retrospective examination of their device's internet history or a historical search regarding applications on their phone, it is very challenging for any third-party custodian to properly monitor whether the defendant is complying with the terms of pre-trial supervision.

## CONCLUSION

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant should be detained pending trial.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

_/s/ Janani Iyengar_
Janani Iyengar
NY State Bar No. 5225990
Chief, Child Exploitation and Human
Trafficking Section
601 D Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-7760
Email: Janani.iyengar@usdoj.gov